**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CORA GALBREATH, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 24-cv-1661 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| HELP AT HOME, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Cora Galbreath, an African-American woman in her 70s, worked for Help at Home, LLC for over a decade. As you might guess, Help at Home provides a helping hand to people as they recover from illnesses at home. Galbreath began as a caregiver, and then became a receptionist.

Galbreath began having trouble when she got a new supervisor. Her new boss seemed to take issue with her race and age. Her boss made comments about her age, and seemed to treat Galbreath unfavorably compared to non-black employees.

To make matters worse, Galbreath suffered from a herniated disk, and had to take medical leave for a few months. When the leave period ended, she applied for an extension, but didn't get it. She then asked for an accommodation for her disability. She didn't get that either. Instead, she got terminated.

Galbreath responded by bringing a dozen claims against her former employer. She alleges that Help at Home discriminated against her based on her race, age, and disability. She brings failure-to-accommodate and retaliation claims, too. Help at Home moved to dismiss.

For the following reasons, the motion to dismiss is granted in part and denied in part.

### Background

At the motion-to-dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

Cora Galbreath formerly worked at Help at Home, LLC ("HAH"). *See* Am. Cplt., at ¶ 27 (Dckt. No. 14). Galbreath is 73 years old and is African American. *Id.* at ¶¶ 32–33.

HAH is a "home care services[] provider that offers at-home care by trained caregivers to assist patients for post-hospital care, extra help on a regular basis, or other high-quality care at home for individuals with chronic illnesses." *See* Mtn. to Dismiss, at 2 (Dckt. No. 20).

HAH hired Galbreath in 2011 as a caregiver. *See* Am. Cplt., at ¶ 27 (Dckt. No. 14). Most recently, Galbreath worked for HAH as a receptionist. *Id.* at ¶ 28.

In 2021, Galbreath noticed "a pattern of discriminatory behavior following a change in supervisors." *Id.* at ¶ 41. Her new supervisor, Iveta Sotirova, was Caucasian/Bulgarian. *Id.* at ¶ 42.

Within thirty days of Sotirova becoming Galbreath's supervisor, Galbreath received "two baseless write-ups." *Id.* at ¶ 43. Before then, Galbreath had never received a write-up in her twelve-year career with HAH. *Id.* at ¶ 44.

Sotirova seemed to have an issue with Galbreath's age. Shortly after the two write-ups, Galbreath had to take a day off due to a neck injury. *Id.* at ¶ 45. But when Galbreath shared the news, Sotirova responded: "Younger people do not have these issues." *Id.* at ¶ 46. And on two other occasions, Sotirova said: "Help at Home is not interested in hiring old people." *Id.* at ¶ 47.

Sotirova seemed to have an issue with Galbreath's race, too. Sotirova "unfairly scrutinized her work and spoke down to her in a way that she did not do to non-African American employees." *Id.* at ¶ 49. And "she would hold staff meetings in Russian, leaving [Galbreath] completely out of the meeting." *Id.* at ¶ 50. When Galbreath complained about feeling excluded, and asked for an update on what was said in meetings, Sotirova refused. *Id.* at ¶ 52.

Galbreath complained about Sotirova's conduct and the disparate treatment to Human Resources several times between May and June 2021. *Id.* at ¶ 53. But Galbreath's complaints fell on deaf ears, and nothing changed. *Id.* at ¶ 54. Instead, someone (the complaint doesn't say who) told Galbreath that she had a "patience issue." *Id.* at ¶ 55.

The negative treatment continued. Sotirova didn't provide Galbreath with the same help that Galbreath had received from her previous managers. *Id.* at ¶ 57.

Galbreath unfortunately suffered a work injury in 2022, requiring nine stitches. But Sotirova refused to call 911 or otherwise help Galbreath. Instead, she said that Galbreath was fine and was overreacting. *Id.* at ¶ 58.

Other receptionists who were not African American were not treated as badly by Sotirova. For example, receptionists "Anna" and "Oxana" (the complaint doesn't give last names) reported to Sotirova, and received better treatment. *Id.* at ¶¶ 59–60. Anna is Asian, and Oxana is Caucasian/Russian. *Id.* at ¶ 59. They were not subject to any "disparaging comments, baseless write-ups, [or] disregard for their wellbeing." *Id.* at ¶ 61. Also, Anna and Oxana were

not excluded from the meetings held in Russian, because both could speak Russian. *Id.* at ¶¶ 51, 61.

At one point, Oxana saw Sotirova "treating [Galbreath] poorly," and said, "in our country, people don't want you working after age 55." *Id.* at ¶ 62.

In July 2023, Galbreath was diagnosed with a herniated disc, nerve pain, and sciatica. *Id.* at ¶ 63. Her disability affects her ability to do basic activities like walking, sitting, lifting, bending, and twisting. *Id.* at ¶ 36. Galbreath applied for and received FMLA leave from July to October 2023. *Id.* at ¶¶ 64–65.

Galbreath's condition required even more leave. On October 31, 2023, Galbreath "submitted documentation from her medical provider and requested an extension of her FMLA leave." *Id.* at ¶ 68. HAH's insurance carrier, MetLife, informed Galbreath that her extension request should be approved. *Id.* at ¶ 67. However, HAH denied Galbreath's extension request. *Id.* at ¶ 69.

At that point, Galbreath requested accommodations under the ADA to get time off. *Id.* at ¶ 70. But HAH did not respond to Galbreath's request. *Id.* at ¶ 71. Instead, HAH terminated Galbreath on November 9, 2023. *Id.* at ¶ 72.

Galbreath sued HAH a few months later. *See* Cplt. (Dckt. No. 1).

HAH moved to dismiss the complaint, and Galbreath later filed an amended complaint. *See generally* Am. Cplt. (Dckt. No. 14).

Galbreath brings a dozen claims under federal and state law. She alleges discrimination on the basis of race, age, and disability, as well as retaliation and failure to accommodate. *Id.*

The claims include: (1) race-based discrimination in violation of 42 U.S.C. § 1981; (2) race-based discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; (3) race-based discrimination in violation of the Illinois Human Rights Act ("IHRA"), 775 ILCS 5 *et seq.*; (4) age-based discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*; (5) age-based discrimination in violation of the IHRA; (6) retaliation in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*; (7) disability-based discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*; (8) failure to accommodate in violation of the ADA; (9) retaliation in violation of the ADA; (10) disability-based discrimination in violation of the IHRA; (11) failure to accommodate in violation of the IHRA; and (12) retaliation in violation of the IHRA. *Id.* at ¶¶ 76–179.

HAH moved to dismiss the amended complaint in its entirety. *See generally* Mtn. to Dismiss (Dckt. No. 20).

**Legal Standard**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). When considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive a Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Iqbal*, 556 U.S. at 678.

**Analysis**

Before getting into the merits, the Court must take a jurisdictional pitstop.

HAH argues that this Court lacks subject-matter jurisdiction over the state-law claims under the IHRA. *See* Mtn. to Dismiss, at 7 (Dckt. No. 20). To support its argument, HAH points to lots of cases from the late twentieth century. *Id.* at 7–8.

Those cases don't reflect current law. Before 2008, the Illinois Human Rights Commission had exclusive jurisdiction over civil-rights actions brought under the IHRA. *See Manley v. City of Chicago*, 236 F.3d 392, 397 (7th Cir. 2001). But in 2008, Illinois amended the IHRA to allow plaintiffs to bring claims in the circuit courts of Illinois. *See De v. City of Chicago*, 912 F. Supp. 2d 709, 731 (N.D. Ill. 2012) (citing 775 ILCS 5/7A-102(c)(4), (f)(2)).

Since 2008, a claim under the IHRA is like a claim under any other state statute. Federal courts have exercised jurisdiction over IHRA claims based on supplemental jurisdiction under 28 U.S.C. § 1367. *Id.* (collecting cases).

Congress has authorized district courts to hear state-law claims when they share common facts with federal claims. "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *See* 28 U.S.C. § 1367. To form the same case or controversy, claims must "derive from a common nucleus of operative facts." *See City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164–65 (1997).

Galbreath brings nearly identical claims under federal law and state law. She brings state-law discrimination claims based on race, age, and disability. *See* Am. Cplt., at ¶¶ 88–93 (Dckt. No. 14) (race-based discrimination); *id.* at ¶¶ 101–07 (age-based discrimination); *id.* at ¶¶ 151–58 (disability-based discrimination). She also brings a failure-to-accommodate claim and a retaliation claim. *Id.* at ¶¶ 159–69 (failure to accommodate); *id.* at ¶¶ 170–79 (retaliation).

4

Galbreath brings essentially the same claims under federal law. She brings race-based discrimination claims under section 1981 and Title VII. *Id.* at ¶¶ 76–87. She brings an age-based discrimination claim under the ADEA, and a disability-based discrimination claim under the ADA. *Id.* at ¶¶ 94–100, 121–29. And she brings failure-to-accommodate and retaliation claims under the ADA, too. *Id.* at ¶¶ 130–50.

It doesn't take much to see that the claims involve a common set of facts. For all intents and purposes, the claims rest on the same set of allegations.

This Court has original jurisdiction over the federal claims. *See* 28 U.S.C. § 1331. This Court also has supplemental jurisdiction over the state-law claims because they involve the same set of facts. There is no meaningful factual daylight between the federal claims and the state-law claims. "[T]hey are all founded on the same allegedly discriminatory conduct, allegedly committed by the same defendants, under the same allegedly discriminatory conditions of employment." *De*, 912 F. Supp. 2d at 732.

With its jurisdictional footing secure, the Court now turns to the merits.

## I.      Race Discrimination (Counts I, II, & III)

Galbreath brings three counts of race-based discrimination. Count I falls under 42 U.S.C. § 1981. *See* Am. Cplt., at ¶¶ 76–81 (Dckt. No. 1). Count II invokes Title VII. *Id.* at ¶¶ 82–87. And Count III relies on the IHRA. *Id.* at ¶¶ 88–93.

### A.      Section 1981

The first claim falls under section 1981, which secures the right to "make and enforce contracts." *See* 42 U.S.C. § 1981(b).

The statute requires equality when it comes to contracts. "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." *See* 42 U.S.C. § 1981(a).

That right includes the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *See* 42 U.S.C. § 1981(b). In the workplace, this right includes the right to be free from harassment and discrimination. *See Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1034 (7th Cir. 1998).

To state a claim under section 1981, a plaintiff must allege that (1) she is a "member[] of a racial minority," (2) "the defendant had an intent to discriminate on the basis of race," and (3) the discrimination concerned "the making and enforcing of a contract." *See Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996); *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756

(7th Cir. 2006); *see also Thurmon v. Mount Carmel High School*, 191 F. Supp. 3d 894, 897 (N.D. Ill. 2016).

As an aside, one wonders whether the first element – being a member of a "racial minority" – is long for this world. Based on the text, the statute protects everybody, not simply members of a racial minority. Everyone must be treated the "same," like an "equal." *See* 42 U.S.C. § 1981(a). "All persons" have the same rights "enjoyed by white citizens," but that doesn't mean that white citizens can't sue. *Id.* "All" means "all," and "equal" means "equal."

The Supreme Court made this point decades ago. The Supreme Court squarely held that section 1981 "is applicable to racial discrimination in private employment against white persons." *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 287 (1976). As Justice Marshall explained for the majority, the Supreme Court "cannot accept the view that the terms of § 1981 exclude its application to racial discrimination against white persons." *Id.*

The statutory phrase "white citizens" does not limit the statute to non-white plaintiffs. *Id.* That "mechanical reading" overlooks the true meaning of the text. *Id.* The Supreme Court has "previously described this phrase simply as emphasizing 'the racial character of the rights being protected.'" *Id.* (citation omitted).

The statute protects equality for all, not equality for some. In fact, the statute would violate the equal-protection component of the Due Process Clause if it *didn't*. *See generally United States v. Vaello Madero*, 596 U.S. 159 (2022) (discussing the equal-protection component of the Due Process Clause). After all, "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007).

It's hard to see why the doors to the federal courthouse should be shut for anyone based on that person's race. If anyone can bring a claim, then everyone can bring a claim. The equal-protection component of the Due Process Clause and the Equal Protection Clause establish a simple, even-handed approach: come one, come all.

Indeed, when evaluating a retaliation claim (rather than a discrimination claim) under section 1981, the Seventh Circuit has not required plaintiffs to plead membership in a racial minority. *See Shott v. Katz*, 829 F.3d 494, 497 (7th Cir. 2016) ("To state a retaliation claim under § 1981 based on events occurring in the workplace, an employee must show that she suffered a materially adverse action because she engaged in protected activity."); *Carter v. Chicago State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015) (noting that section 1981 "protects the right of all persons to make and enforce contracts regardless of race") (internal quotation marks omitted).

In a similar vein, the Supreme Court is poised to hear a case about whether Title VII requires the same standard of proof for discrimination claims, regardless of whether the plaintiff is from a majority or a minority group. *See Ames v. Ohio Dep't of Youth Servs.*, 87 F.4th 822 (6th Cir. 2023), *cert. granted*, 145 S. Ct. 118 (2024). Maybe that case will shed some light.

By the look of things, the Seventh Circuit hasn't addressed a section 1981 claim and restated the element of membership in a racial-minority group since 2006 (in *Pourghoraishi*). Maybe someday the Seventh Circuit will give it another look.

But in the meantime, the Court takes the law as it finds it. The Seventh Circuit has said that a discrimination claim under section 1981 requires a showing that a plaintiff is a member of a racial minority. Galbreath checks that box.

HAH didn't give this Court a reason to dismiss the section 1981 claim. HAH moved to dismiss the complaint "in its entirety." *See* Mtn. to Dismiss, at 1 (Dckt. No. 20). But when it came to the section 1981 claim, HAH came up short.

HAH made arguments about the race-based discrimination claim under Title VII, and under the IHRA. *Id.* at 3–6. But HAH didn't mention the race-based discrimination claim under section 1981, at least not specifically.

The omission is a waiver. "Long-standing under our case law is the rule that a person waives an argument by failing to make it before the district court." *See Disc. Inn, Inc. v. City of Chicago*, 72 F. Supp. 3d 930, 933 (N.D. Ill. 2014) (quoting *Alioto v. Town of Lisbon,* 651 F.3d 715, 721 (7th Cir. 2011)), *aff'd*, 803 F.3d 317 (7th Cir. 2015). And likewise, "[i]t is well established in our precedents that skeletal arguments may be properly treated as waived." *Moore v. Dart*, 2024 WL 361240, at \*9 (N.D. Ill. 2024) (quoting *Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011)).

At best, HAH faults Galbreath for not showing that she was "treated differently from similarly situated employees outside [her] protected class." *Id.* at 4–5. By the look of things, HAH was addressing the claim under the Title VII, not the claim under section 1981. Even so, the argument doesn't go anywhere. As discussed below, a plaintiff must make that showing at the summary-judgment stage, not the motion-to-dismiss stage.

Galbreath's section 1981 claim (Count I) survives.

**B.     Title VII**

The next claim is a race-discrimination claim under Title VII.

Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color." *See* 42 U.S.C. § 2000e-2(a)(1).

A plaintiff must make a relatively modest showing to state a claim for discrimination at the pleading stage. "Satisfying Rule 8 and the accompanying standards articulated by the Supreme Court in *Twombly* and *Iqbal* does not require a plaintiff to plead a prima facie case of employment discrimination." *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 777 (7th Cir. 2022).

"Put more plainly, a plaintiff need not allege facts aligning with her claim's every element, which she will have to prove for her claim to survive summary judgment." *Id.*

That said, a complaint cannot simply allege the elements of a claim, and then call it a day. After all, the Supreme Court in *Twombly* and *Iqbal* talked about the need for facts. *See Twombly*, 550 U.S. at 555. A complaint needs to offer more than a headline, leaving the reader hanging for more.

In the employment discrimination context, the Seventh Circuit "has said these requirements mean a plaintiff must advance plausible allegations that she experienced discrimination because of her protected characteristics." *Kaminski*, 23 F.4th at 776. In *Kaminski*, the Seventh Circuit upheld the dismissal of a complaint that alleged termination based on race, but failed to offer any facts that told a plausible story.

"Rule 8 requires more. Beyond saying Elite Staffing wrongfully discharged her, Kaminski includes no factual allegations directly or indirectly connecting the termination with her national origin, age, or race. It is not enough for the complaint to observe only that federal law prohibits adverse employment actions on those grounds. There must be some *facts* that make the wrongful discharge contention plausible." *Id.* (emphasis in original).

Summary judgment is a tougher climb. To get there, a plaintiff can go down one of "two paths." *See Gamble v. County of Cook*, 106 F.4th 622, 625 (7th Cir. 2024).

When pursuing a Title VII claim at the summary-judgment stage, a plaintiff without any "smoking-gun" direct evidence of discrimination often will proceed using the burden-shifting framework created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Another option is to present evidence in a "holistic fashion." *See Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040 (7th Cir. 2023); *see also Ortiz v. Werner Enters.*, 834 F.3d 760, 766 (7th Cir. 2016) (explaining that "all evidence belongs in a single pile and must be evaluated as a whole").

The *McDonnell-Douglas* framework has three steps: (1) a plaintiff must establish a prima facie case of discrimination; (2) if the plaintiff successfully does so, the defendant must establish a legitimate, non-discriminatory reason for the challenged action; and (3) if the defendant successfully does so, the plaintiff must then establish that those proffered reasons were mere pretext. *See Whittaker v. N. Illinois Univ.*, 424 F.3d 640, 647 (7th Cir. 2005).

To make out a prima facie case of discrimination (again, at the summary-judgment stage), a plaintiff must show: "(1) she is a member of a protected class, (2) her job performance met [her employer's] legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff." *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 750–51 (7th Cir. 2006).

HAH makes two arguments for dismissal. HAH first points out that the complaint does not identify a similarly situated individual who received better treatment. *See* Mtn. to Dismiss, at 9–11 (Dckt. No. 20). That's true. But that's unnecessary at the motion-to-dismiss stage.

A complaint "certainly does not need to identify . . . a similarly situated employee who managed to avoid termination." *See Kaminski*, 23 F.4th at 777; *see also Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 830 (7th Cir. 2014) ("[T]he identity of the employer's decision-maker and the employer's stated reason for its decision are critical in figuring out who else might have been similarly situated. The employee often will not be able to answer those questions without discovery."); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008).

HAH's second argument gets more traction. As HAH points out, the complaint does not allege facts that could give rise to a plausible inference that Galbreath suffered an adverse action based on her race.

Galbreath offers a few reasons to support the notion that the company discriminated against her based on her race. She points to the fact that she received "two baseless write-ups," and endured "disparaging comments." *See* Am. Cplt., at ¶ 43 (Dckt. No. 14). The company showed "disregard for [her] wellbeing," and she suffered through "exclusion from meetings." *Id.* at ¶ 61.

This Court accepts those allegations as true, as it must at the motion-to-dismiss stage. Even so, the allegations do not rise to the level of an adverse employment action.

"Typically, adverse employment actions are economic injuries." *Whittaker*, 424 F.3d at 647. Other forms of adversity may count, too. But to count as an adverse action, "the adverse action must materially alter the terms and conditions of employment." *Stutler*, 263 F.3d at 703.

Making disparaging comments isn't a good way to treat anyone. No one wants to feel excluded from meetings, either. Even so, that type of conduct does not materially alter the terms and conditions of employment.

Getting a write-up, standing alone, is not an adverse action. While baseless write-ups could be "putatively disciplinary measures, none 'result[ed] in tangible job consequences and therefore are not adverse employment actions actionable under Title VII.'" *Whittaker*, 424 F.3d at 647 (quoting *Longstreet v. Illinois Dep't of Corr.*, 276 F.3d 379, 384 (7th Cir. 2002)).

True, Galbreath did lose her job. *See* Am. Cplt., at ¶ 72 (Dckt. No. 14). Termination is undoubtedly an adverse employment action. *See, e.g.*, *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 889 (7th Cir. 2016) ("A termination is undoubtedly an adverse employment action."); *Swidnicki v. Brunswick Corp.*, 23 F. Supp. 3d 981, 931 (N.D. Ill. 2014) ("Without question, termination is an adverse employment action."). Putting someone out of work is the ultimate work-related adverse action.

But the complaint does not allege that the company fired her based on her race. Instead, the complaint alleges that Galbreath "was terminated in retaliation for requesting reasonable accommodations under the ADA and taking FMLA leave." *See* Am. Cplt., at ¶ 75 (Dckt. No. 14).

9

A bare-bones allegation that she lost her job based on her race would not satisfy Rule 8, either. A complaint cannot simply say that a company "wrongfully discharged her." *See Kaminski*, 23 F.4th at 776. Instead, a complaint must include "factual allegations directly or indirectly connecting the termination with her . . . race." *Id.*

The allegations about Galbreath's race are noticeably slim when compared to the allegations about her age. The complaint alleges that her supervisor made comments about her age when talking about her neck injury. *See* Am. Cplt., at ¶ 46 (Dckt. No. 14). Her boss also said that the company was not interested in hiring old people. *Id.* at ¶ 47.

The complaint does not offer anything comparable when it comes to her race. Again, "it is not enough for a complaint to allege labels and conclusions without providing facts." *See Kaminski*, 23 F.4th at 777.

The complaint does allege that her supervisor held meetings in Russian, which left Galbreath out in the cold. But treating someone differently based on her language is not the same thing as treating someone differently based on her race. In fact, treating someone differently based on her language is not the same as national-origin discrimination, either. *See Ortiz v. Amazon.com Servs., LLC*, 2025 WL 890107, at *4 (N.D. Ill. 2025).

To state a claim, the complaint needed to "aver that the employer instituted a (specified) adverse employment action against the plaintiff on the basis of her [race]." *Tamayo*, 526 F.3d at 1084. Galbreath's complaint falls short of that standard.

The claim under Title VII (Count II) is dismissed.

## C.     IHRA

Galbreath also brings a state-law claim of racial discrimination under the IHRA, but it meets the same fate.

Illinois courts use the Title VII framework to analyze employment-discrimination claims brought under the IHRA. *See Zaderaka v. Illinois Hum. Rts. Comm'n*, 545 N.E.2d 684, 687 (Ill. 1989). So, the analysis of her IHRA claim is the same as her Title VII claim.

This Court thus dismisses Galbreath's claim of race discrimination under the IHRA (Count III).

## II.     Age Discrimination (Counts IV & V)

Galbreath brings two claims of age-based discrimination. Count IV is a claim under the ADEA, and Count V is a claim under the IHRA. *See* Am. Cplt., at ¶¶ 94–107 (Dckt. No. 14).

### A.    ADEA

The ADEA makes it "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." *See* 29 U.S.C. § 623(a)(1).

HAH makes the same argument under the ADEA that it made when challenging the race-based discrimination claim. HAH faults Galbreath for failing to point to younger, similarly situated employees who received better treatment. *See* Mtn. to Dismiss, at 6 (Dckt. No. 20).

That argument might have legs at the summary-judgment stage. But it has nowhere to go at the motion-to-dismiss stage.

"The tests under the ADEA and Title VII are virtually identical at this stage, in this case merely requiring the court to substitute age for [race] as the protected class but otherwise applying the same tests." *Stone v. Bd. of Trs. of N. Illinois Univ.*, 38 F. Supp. 3d 935, 945 (N.D. Ill. 2014) (citing *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014)); *see also Atanus v. Perry*, 520 F.3d 662, 672 (7th Cir. 2008).

Again, Galbreath only needs to allege "enough facts to allow for a *plausible* inference that the adverse action suffered was connected to her [age]." *See Kaminski*, 23 F.4th at 777 (emphasis added). At this stage, Galbreath "certainly does not need to identify . . . a similarly situated employee who managed to avoid termination." *Id.* (citing *Tamayo*, 526 F.3d at 1084).

Later, when it comes time to offer admissible evidence, Galbreath must bring more to the table. At the summary-judgment stage, she must show that "(1) she belongs to a protected class [here, age]; (2) she performed her job according to [HAH's] legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated more favorably by [HAH]." *Atanus*, 520 F.3d at 672–73.

For now, the complaint is all that matters. And the complaint offers more than enough facts to give rise to a plausible inference of age discrimination.

For starters, Galbreath is 73 years old. *See* Am. Cplt., at ¶¶ 30, 33, 97 (Dckt. No. 14). She also offers examples of mistreatment based on her age.

The complaint alleges that her supervisor made disparaging comments about her age. Her boss made an insensitive remark about her health, saying that younger people did not have issues like neck injuries. *Id.* at ¶ 47. He boss also remarked that HAH was not interested in hiring old people. *Id.*

Another coworker commented on her age, too. She told Galbreath that "in our country, people don't want you working after age 55." *Id.* at ¶ 62.

11

Most importantly, Galbreath alleges that the company fired her.  *Id.* at ¶ 72.  True, the complaint doesn't come out and say that the company terminated her because of her age.  It says that the company let her go because of her disability.

Still, based on the complaint, Galbreath's age and her health seem intertwined.  A plausible reading of the complaint is that the company fired her, at least in part, because of her age.  The facts are enough to "provide the defendants with sufficient notice to begin to investigate and defend against her claim."  *Tamayo*, 526 F.3d at 1084.  So, Galbreath's claim of age discrimination under the ADEA survives.

The same conclusion applies to the claim under the IHRA.  "The Seventh Circuit applies the same overall analysis to claims under Title VII, the ADEA, and the IHRA."  *Gray v. Arrow Elecs., Inc.*, 2019 WL 1399945, at *3 (N.D. Ill. 2019) (citing *David v. Bd. of Tr. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017)); *Ortiz*, 834 F.3d at 766.

Galbreath's age-discrimination claim under the ADEA survives, so her claim under the IHRA survives too.  *See Huber v. Fox Valley Park Dist.*, 2021 WL 1546425, at *5 (N.D. Ill. 2021) (citing *Sabet v. City of N. Chicago*, 2020 WL 832360, at *18 (N.D. Ill. 2020)); *Wyman v. Evgeros, Inc.*, 2017 WL 386651, at *2 (N.D. Ill. 2017).

Galbreath's claims of age discrimination under the ADEA and the IHRA (Counts IV & V) survive.

## III.    Retaliation (Counts VI, IX, & XII)

Next, Galbreath brings three retaliation claims.

Count VI is a retaliation claim about her FMLA leave.  Galbreath alleges that the company retaliated against her for taking FMLA leave, and then terminated her when she returned and requested an extension.  *See* Am. Cplt., at ¶¶ 108–120 (Dckt. No. 14).

Count IX is about the ADA.  Galbreath alleges that the company retaliated against her by firing her after she requested reasonable accommodations under the ADA.  *Id.* at ¶¶ 141–50.

Count XII is another retaliation claim, except that it falls under the IHRA.  *Id.* at ¶¶ 170–79.

The Court will start with the FMLA claim.  The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" provided by the FMLA.  *See* 29 U.S.C. § 2915(a)(1).  In other words, the statute prohibits retaliation against an employee for exercising her FMLA rights.  *Id.*; *see also* 29 C.F.R. § 825.220(a)(2).

"To state a claim for FMLA retaliation, the plaintiff must allege the following:  (1) he or she engaged in a statutorily protected activity; (2) he or she suffered an adverse action; and (3) a causal link between the protected activity and the adverse action."  *Ryan v. Pace Suburb. Bus*

*Div. of Regional Transp. Auth.*, 837 F. Supp. 2d 834, 838 (N.D. Ill. 2011) (citing *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 670 (7th Cir. 2011)).

The complaint alleges that Galbreath engaged in protected activity by taking FMLA leave from July 2023 to October 2023. *See* Am. Cplt., at ¶ 115 (Dckt. No. 14) ("Plaintiff took FMLA leave from in or around July 2023 to October 2023.").

HAH argues that the complaint does not allege "an incident sufficient to rise to the level of materially adverse action." *See* Mtn. to Dismiss, at 11 (Dckt. No. 20). That argument is hard to square with the complaint.

The complaint squarely alleges that the company terminated her. *See* Am. Cplt., at ¶ 72 (Dckt. No. 14). The termination took place less than a month after she returned from FMLA leave. *Id.* at ¶¶ 65, 72.

Galbreath alleges that she "was terminated in retaliation for requesting reasonable accommodations under the ADA and taking FMLA leave." *Id.* at ¶ 75. And again, termination is *the* adverse employment action. *See Barton*, 662 F.3d at 453–54.

HAH doesn't make any other argument against Galbreath's retaliation claim. So the FMLA retaliation claim survives.

At one point, HAH does argue that Galbreath fails to adequately plead FMLA interference. *See* Mtn. to Dismiss, at 13 (Dckt. No. 20). But Galbreath didn't bring an FMLA interference claim. In other words, Galbreath is not claiming that HAH stopped her from exercising her rights. Instead, she claims that Galbreath terminated her in retaliation for exercising her rights.

Galbreath's other retaliation claims survive as well, for the same reasons.

The ADA prohibits retaliation against "any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." *See* 42 U.S.C. § 12203(a). In plain English, the ADA prohibits retaliating against individuals for exercising their rights under the ADA.

To state a retaliation claim under the ADA, a plaintiff must demonstrate "that she engaged in protected activity, that she suffered an adverse action, and that there is a causal connection between the two." *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 243 (7th Cir. 2018).

Galbreath alleges that she "requested reasonable accommodations under the ADA in the form of time off" to deal with her disability of "a herniated disc, nerve pain, and sciatica." *See* Am. Cplt., at ¶¶ 63, 70. "Protected activities include asserting one's rights under the [ADA] either by seeking accommodation or by raising a claim of discrimination due to disability." *Id.*

Galbreath alleges that she engaged in protected activity. HAH does not dispute that the complaint alleges a protected activity.

Instead, HAH trots out the argument that Galbreath did not suffer an adverse employment action. But again, the complaint alleges that HAH terminated Galbreath on November 9, 2023. *See* Am. Cplt., at ¶ 72 (Dckt. No. 14). And it alleges that "[Galbreath] was terminated in retaliation for requesting reasonable accommodations under the ADA and taking FMLA leave." *Id.* at ¶ 75. That's enough.

The same analysis applies to the IHRA retaliation claim. The IHRA prohibits retaliating against a person who "requested, attempted to request, used, or attempted to use a reasonable accommodation." *See* 775 ILCS 5/6-101(A)(iii). "[R]etaliation claims under the IHRA incorporate the standards for Title VII retaliation claims." *See Walker v. City of Markham*, 676 F. Supp. 3d 623, 632 (N.D. Ill. 2023) (citing *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 382–83 (7th Cir. 2016)).

"Pleading a retaliation claim under Title VII requires the plaintiff to 'allege that she engaged in a statutorily protected activity and was subjected to an adverse employment action as a result.'" *See Carlson*, 758 F.3d at 828 (quoting *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1029 (7th Cir. 2013)).

Again, HAH's only argument is that Galbreath did not suffer a materially adverse employment action. The complaint alleges that she did. So the complaint rolls forward.

The three retaliation claims (Counts VI, IX, & XII) survive.

## IV.     Disability-Based Discrimination (Counts VII and X)

The next two claims allege discrimination on the basis of a disability.

Count VII falls under the ADA. Galbreath alleges disability-based discrimination when HAH terminated her on the basis of her disability. *See* Am. Cplt., at ¶¶ 121–29 (Dckt. No. 14). Count X alleges the same thing, except that it is a claim under the IHRA. *Id.* at ¶¶ 151–58.

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *See* 42 U.S.C. § 12112(a).

The ADA imposes some procedural requirements that a plaintiff must satisfy before bringing a claim in federal court. *See* 42 U.S.C. § 12117(a). A plaintiff "must first exhaust his administrative remedies by filing charges with the EEOC and receiving a right to sue letter." *See Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019).

After getting a right-to-sue letter, a plaintiff cannot sue for anything and everything. A plaintiff "may bring only those claims that were included in her EEOC charge, or that are 'like or

reasonably related to the allegations of the charge and growing out of such allegations.'" *Id.* (quoting *Geldon v. S. Milwaukee Sch. Dist.*, 414 F.3d 817, 819 (7th Cir. 2005)).

HAH argues that Galbreath did not exhaust her administrative remedies. The company acknowledges that Galbreath "did file an EEOC charge." *See* Mtn. to Dismiss, at 14 (Dckt. No. 20). But the company believes that she "did not check the box for disability or allege disability as a ground for her claim." *Id.*

That argument is hard to square with the charges that Galbreath filed with the EEOC. Galbreath filed two charges with the EEOC. In her first charge, Galbreath didn't check the box for disability-based discrimination. *See* Ex. A, at 1 (Dckt. No. 14-1).

But Galbreath did allege disability-based discrimination in her second charge. On that form, under "DISCRIMINATION BASED ON," Galbreath checked off "RETALIATION" and "DISABILITY." *See* Ex. D, at 1 (Dckt. No. 14-4).

Galbreath later received right to sue letters for both of those charges. *See generally* Ex. B (Dckt. No. 14-2); Ex. E (Dckt. No. 14-5). So, Galbreath properly exhausted her administrative remedies.

The next question is whether the complaint states a claim. A claim for disability-based discrimination under the ADA requires a plaintiffs to allege that: "(1) [s]he is disabled; (2) [s]he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by h[er] disability." *Roberts v. City of Chicago*, 817 F.3d 561, 565 (7th Cir. 2016).

HAH argues that the complaint does not allege that Galbreath suffered from a disability. HAH also argues that the complaint fails to allege that the company knew about any such disability. *See* Mtn. to Dismiss, at 14–15 (Dckt. No. 20).

The ADA defines a disability as "a physical or mental impairment that substantially limits one or more of the major life activities" of the individual, "a record of such impairment," or "being regarded as having such an impairment." *See* 42 U.S.C. § 12102(1).

An impairment substantially limits a major life activity when a person "is either unable to perform a major life activity or is significantly restricted as to the condition, manner or duration under which the individual can perform the major life activity as compared to the average person in the general population." *Prince v. Illinois Dep't of Revenue*, 73 F. Supp. 3d 889, 893 (N.D. Ill. 2010) (quoting *Furnish v. SVI Sys., Inc.*, 270 F.3d 445, 450 (7th Cir. 2001)); *see also* 29 C.F.R. § 1630.2(j).

Major life activities include "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *See Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 923 (7th Cir. 2001) (citing 29 C.F.R. § 1630.2(i)).

Here, there is not much doubt that the complaint alleges that Galbreath had a disability. The complaint alleges that she has "a herniated disc that causes nerve and sciatica pain." *See* Am. Cplt., at ¶ 35 (Dckt. No. 14). The herniated disc limits her ability to walk, sit, lift, bend, and twist, because it limits her movement and ability to lift without pain. *Id.* at ¶ 36.

When it's hard to walk, sit, lift, bend, and twist, it's hard to do just about anything.

The complaint also alleges that HAH knew about the disability. In fact, the complaint alleges that the company approved her request for FMLA leave. *See* Am. Cplt., at ¶¶ 64–65 (Dckt. No. 14). Galbreath went on leave from July 2023 to October 2023. *Id.* Then, in October 2023, Galbreath "submitted documentation from her medical provider and requested an extension of her FMLA leave." *Id.* at ¶ 68. At that point, the company denied her request for an extension, and then fired her. *Id.* at ¶¶ 69, 72.

It's hard to see how HAH can argue that the complaint lacks allegations about the company's knowledge. The complaint alleges that the company approved her request for FMLA leave, denied her request for an extension, and then denied her request for an extension under the ADA.

HAH does not make any specific argument to dismiss the IHRA claim of disability-based discrimination. That claim survives too.

In sum, the two claims about disability-based discrimination (Counts VII and X) survive.

## V.     Failure-to-Accommodate Counts (Counts VIII and XI)

At long last, the Court has reached the last two claims. Galbreath alleges a failure to accommodate her disability. Count VIII falls under the ADA, and Count XI falls under the IHRA. *See* Am. Cplt., at ¶¶ 130–40, 159–69.

To state a failure-to-accommodate claim under the ADA, a plaintiff must show: "(1) the plaintiff [is] a qualified individual with a disability; (2) the employer must be aware of the plaintiff's disability; and (3) the employer must have failed to reasonably accommodate the disability." *See Brumfield v. City of Chicago*, 735 F.3d 619, 631 (7th Cir. 2013).

HAH rehashes the same arguments. Suffice it to say that Galbreath exhausted her administrative remedies. The complaint alleges that she had a disability, and that the company knew it.

The company doesn't unveil any other argument for the dismissal of the claim under the IHRA. So it lives on.

The failure-to-accommodate claims (Counts VIII and XI) survive.

## Conclusion

For the foregoing reasons, Defendant's motion to dismiss is granted in part and denied in part. Counts II and III (race-based discrimination under Title VII and the IHRA) are dismissed. The motion to dismiss is otherwise denied.

Date:  March 26, 2025

_____
Steven C. Seeger
United States District Judge